[Civ. No. 47167. Second Dist., Div. Two. Apr. 1, 1976.]

DOLORES S. LEWIS et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
GREEN'S MUSIC COMPANY et al., Respondents.

**Counsel**

Thompson, Talbott & Lemaster and George D. Thompson for Petitioners.

Allen, Rhodes & Sobelsohn and David B. Allen for Respondents.

**Opinion**

**FLEMING, Acting P. J.**—In August 1968 Lewis, a television serviceman, then 45, suffered orthopedic injuries in a work-related automobile

accident. In July 1972, he died of heart disease. The single question in these compensation proceedings is whether the disability, discomfort, and pain consequent to the 1968 accident contributed to his death from coronary atherosclerosis in 1972.

Lewis's widow filed two claims of entitlement to death benefits. In one, she claimed the pain suffered by the injured employee as a consequence of the automobile accident produced stress which accelerated his arteriosclerosis and caused his death from heart disease four years later. In the other, she claimed the work performed by Lewis on resumption of his employment after the accident increased his pain and thereby created stress, which accelerated his arteriosclerosis and led to his death from heart disease.

On the basis of lay testimony and two conflicting medical opinions, Compensation Judge Daraban accepted the claim that Lewis's death was compensable by reason of pain and stress resulting from the accident. He rejected the claim for compensation based on stress caused by Lewis's employment subsequent to his accident. The Worker's Compensation Appeals Board ordered reconsideration, appointed an independent medical examiner, and referred both claims to Compensation Judge Trovillion for further hearings. The latter took further medical testimony and reported back to the board. On the basis of the evidence before both judges, the board found Lewis's death not compensable under either claim.

The Supreme Court, citing *Lamb* v. *Workmen's Comp. Appeals Bd.,* 11 Cal.3d 274, 281-283 [113 Cal.Rptr. 162, 520 P.2d 978], granted a hearing, transferred the cause to this court, and directed a writ of review to issue.

### THE EVIDENCE

The claim based on decedent's employment subsequent to his accident was decided adversely to claimant, and that decision is not controverted here. The claim based on decedent's pain resulting from his orthopedic injuries reasons that this pain caused stress, which in turn accelerated the progress of his underlying arteriosclerotic heart disease and led to his death. We review the relevant evidence.

In an automobile intersection collision in August 1968 Lewis suffered bruises, contusions, headaches, dizziness, fainting sensations, and pains of the cervical spine, lumbar spine, shoulder, and elbow. He returned to

work within three weeks and continued in the same occupation with different employers until his death in July 1972. However, he no longer lifted television sets or installed antennas. In July 1971 Lewis was awarded 61 percent partial permanent disability. The rating was based on scarring and limitation of motion and on "subjective back complaints consistent with a 60% loss of lifting ability and need to be restricted to work of light to moderate nature . : . plus constant slight but clearly apparent involuntary shaking of the head." The award authorized "further medical treatment . . . including house traction equipment." Lewis's principal continuing complaint consisted of chronic pain on his left side, especially in his low back and buttock, for which he received medication and physiotherapy, including traction.

Subsequent to the award (and hence during the last year of his life) Lewis was regularly seen by orthopedists, his hospital physiotherapy continued, sometimes on a thrice-weekly basis, and his prescribed medication included "Indocin," an anti-inflammatory and analgesic agent. In March 1972, he complained to his physician that despite his therapy he felt he was "retrogressing." At the time of his death Lewis worked 40 hours a week, with Sundays and Mondays off. Sunday, 30 July 1972, was a day of inactivity. On Monday he drove from Pomona to Los Angeles to pick up a check and accompanied his children to the dentist. In the afternoon he went swimming. About 10 p.m. his wife observed him gasping for breath and called for assistance. He was pronounced dead on arrival at the hospital.

An autopsy ascribed death to occlusive coronary atherosclerosis with severe pulmonary congestion. The immediate mechanism of death was a period of coronary insufficiency lasting minutes or hours, which caused fluid to back into the lungs and led to arrythmia or ventrical fibrillation. The autopsy disclosed that certain of his coronary arteries were 50 percent occluded. At the time of his death Lewis was 6 feet, 1 inch tall, and weighed 240 pounds. The only earlier indication of cardiovascular history was a 1942 diagnosis of hypertension while in the military service.

Four lay witnesses and two physicians testified in the first proceeding. Judge Daraban summarized the lay testimony thus:

"The testimony of Lena Pock reveals that the decedent formerly worked for her and her husband as a service man from October of 1958 until March 1, 1967, when they went out of business. The decedent never missed a day from work and he was proud of his good health. After he

left their employment he was seen about once every two weeks. After the automobile accident of August 24, 1968, until the time of his death, she observed there was a big change and that he talked about his ill health. He was not as alive or vivacious as before.

"Rudi Pock testified that during the time the deceased worked for him, he thought the deceased was an athletic and well-put together man, and that he handled equipment weighing up to 700 pounds by himself and set it up at the customer's. After the 1968 automobile accident, he remembers the deceased telling him that he was disappointed in his progress and that he wasn't snapping out of it. There was a rather definite spring in his step that was no longer there. His talk and speech were more measured·and that extra sparkle that he had before was not quite there anymore subsequent to the accident.

"Grace Lewis Johnson testified that she had been a medical secretary for 22 years and was a sister of the decedent. They had a close relationship and they confided in each other. She testified that 'he was not a complainer, but from the time of his accident until the time of his passing, he was not able to do what he normally did before. He couldn't maneuver because of pain . . . she knew that he was getting therapy and taking Indocin for medication. The condition of her brother's health became progressively worse in the last year after his accident. . . . This was not the same Edwin she knew . . . As far as she knew he bent with pain; he couldn't lift and she knew of it. He limped after the accident and this never did leave him. He became one-sided in her eyes. She saw her brother taking pain medication and muscle relaxant.'

"The widow, Dolores S. Lewis, testified that 'he was in good health until August 24, 1968 . . . After that time he complained of pain to his back and had complaints to his left hand and left leg. He had these complaints every night . . . . Since his injury of August 24, 1968, physically he was always tired. He constantly complained of back pain and had to get up in the evening to urinate frequently. When he would get up in the morning he had to shake his left leg. He couldn't get up like he used, and would have to sit 10 to 15 minutes on the side of the bed before he could get up. Medication as prescribed by the doctor was taken and she saw him taking it twice a day . . : She rubbed his back and had a traction device which was prescribed for him, and it was used every night."

All the testifying physicians were familiar with this lay evidence, as well as with decedent's medical record.

Dr. Alan Frank, for the claimant, reported: "It is apparent that Mr. Lewis died of complications of long standing and progressive coronary artery sclerosis. It is my opinion that the pain, disability and emotional stress that Mr. Lewis experienced as a result of his work incurred injuries materially aggravated and accelerated the process of sclerosis within his coronary arteries hastening the onset of coronary artery insufficiency."

As summarized by Judge Daraban, Dr. Frank testified: "The injury on August 24, 1968 resulted in a chronic back problem and emotional stress was generated by that injury. This aggravated, and accelerated the process of sclerosis in his coronary arteries and it made him susceptible to coronary insufficiency. Before his death he had an episode of coronary insufficiency lasting minutes or perhaps hours, resulting in ventricular arrhythmia and irregularity of the heart, resulting in death. The emotional stress here resulted from pain and discomfort and his disability causing anxiety and a sense of frustration. This is common to such back injuries and these feelings are to be considered stressful. They are perceived by the brain and trigger a series of neurological and endocrine changes, resulting in an aggravation of underlying coronary arteriosclerosis. Pain is different from emotional stress, but worry and apprehension will have the same effect in the end on the neuro-glandular endocrine system. The human body can react only in a certain amount of limited ways to stress by an outpouring of adrenalin and stimulation of the adrenal cortex occurs, putting adrenal and corticosterone compounds into the system . . ."

With particular reference to pain as stress, he testified: "I don't know of any publication that would imply, indicate pain per se, just the sensation of pain as being a factor responsible for causing or aggravating coronary heart disease. But when one reads this literature, one realizes that many of the studies are talking about situations that are associated with pain. Then they, the studies talk about emotional stress, but pain is emotionally stressful. I don't think we can get away from the fact that the perception of pain is emotional stress, just like the apprehension of anxiety, the feeling of anxiety, or the feeling of worry, or the feeling of depression, or the feeling of frustration, or the feeling of working under a tight time schedule. All of these things are emotional stress, and although the types of emotional stress that we can perceive are several, the ways in which the body mechanism can react to emotional stresses are limited."

Asked about the contribution of even a minor injury, he replied: "Well, it would be helpful to have more facts, but I think I can answer this line of questions by saying that you can reduce my argument to an absurdity, of course, by simply picking up every minor injury and say that this has been stressful. I can only say that life as we all experience it is a succession of stresses and I think our coronary arteries respond gradually and slowly to all these stresses; that is the life history of coronary heart disease."

Dr. Alvin Markovitz, for defendants, reported: "Coronary arteriosclerosis is a metabolic process which develops over the years; it is generally asymptomatic, and there is no evidence that at any time did he have chest pain or angina. If the pain and discomfort was considered to have aggravated his heart over the years, there is a question of how much pain was actually present. I would have expected him to have heart symptoms long before, and to have heart symptoms during episodes of pain. No such symptoms are indicated in the history. I would therefore feel that the statement that the patient's work-related injury contributed to his death would be a rather nebulous opinion without any real scientific basis to support it."

His testimony, as summarized by Judge Daraban, included these points:

"He heard Dr. Frank's theory of stress and he agrees with some aspects and disagrees with others. Dr. Frank's theory is speculative and is not based upon facts. There are factors such as nervousness, shaking, clotting mechanisms, increasing of platelets which can cause changes in the arteries by increasing free fatty acids and causing a myocardial infarction. Chronic stress experienced by a lawyer, doctor or policeman is felt by the AMA to not cause metabolic changes. Adrenal excess results in hyperventilation, shakiness, nervousness, outpouring of some kind of compound and such cases would be obvious to all.

"He doubts if pain here would have accelerated arteriosclerosis. It is his opinion that the way the decedent died had no relationship to his auto accident in 1968. Pain can cause stress resulting in the pumping of adrenalin into the system. However, he does not accept the theory that every stress affects the system in this manner. . . . There was development of arteriosclerosis over 25-30 years of his life. He would eliminate pain as being a factor causing arteriosclerosis."

He summarized his view in testimony as follows: "What I'm really trying to say is that I believe had this man [been] having periods of excess adrenal hormones pouring into his bloodstream, I think it would have been rather obvious to all and I think that from the records I reviewed and from the testimony I heard today that this man likely did not have these periods of hormonal excess, and essentially, therefore, there is really no evidence that if this man had pain that it was of the stressful situation which would have accelerated his arteriosclerosis which would have any effect on his death."

Judge Daraban accepted the medical opinion of Dr. Frank and concluded that pain resulting from the accident caused stress which aggravated and accelerated the process of sclerosis that brought about decedent's death. At the same time he rejected the claim that decedent's employment subsequent to the accident produced stress which contributed to his death. There was thus a square finding that decedent's stress was pain-induced and not work-induced.

Thereafter the board granted reconsideration for the purpose of obtaining additional medical evidence and referred the cause to Judge Trovillion.

The independent medical examiner appointed by the board, Dr. Weldon Walker, director of the White Memorial Cardiac Laboratory, clinical professor of internal medicine at U.S.C. Medical School and Loma Linda University, and formerly chief cardiologist at Walter Reed Army Hospital, reported: "It is generally believed that death from coronary artery disease is the end result of progressive narrowing of the coronary arteries related to a metabolic process which goes on over a period of many years. Most of this time the disease is totally asymptomatic and death or disability results when this progressive narrowing of the arteries to the heart reach a critical stage of narrowing. There are many known predisposing factors which increase the risk of developing coronary heart disease. The major known provable risk factors are: 1) Elevated lipid levels such as cholesterol and triglycerides circulating in the blood stream. 2) High blood pressure. 3) Cigarette smoking. 4) Over-weight. 5) Diabetes. 6) Family history of coronary heart disease. 7) Male sex. 8) Advancing age. 9) Family history of diabetes. Possible controversial risk factors predisposing to coronary heart disease are: 1) Stress. 2) Coffee drinking. 3) Drinking soft water."

Of the known risk factors, Dr. Walker found four in decedent's record: (1) high blood pressure, (2) overweight, (3) family history of diabetes, (4) family history of heart trouble (unspecified).

On stress his report stated:

"The relationship of stress to death from coronary heart disease is an extremely controversial conflicting and difficult subject and should be considered in two areas. 1) The relationship of stress to acute myocardial infarction. 2) The relationship of chronic, long-wearing stress to the development of coronary atherosclerosis over a period of years . . . .

"I am unaware of any evidence that chronic stress has anything to do with the formation of chronic coronary heart disease, except as through the mechanism of the above listed known risk factors that predispose to coronary heart disease. . . .

"It seems highly unlikely that patient's multiple injuries on August 24, 1968 contributed significantly either to his progressive atherosclerosis of the coronary arteries or to his sudden death from probable cardiac arrythmia and acute coronary insufficiency. It is far more likely that this was the natural consequences of the previously enumerated risk factors and it is not considered that the prior injury was the proximate cause of the patient's death. Neither does it seem reasonable that work subsequent to this injury contributed to the disease process leading to this patient's death."

In his testimony, as reported by Judge Trovillion, Dr. Walker said:

"He concedes that it is a very controversial area of medicine relating to the causative effect of emotional stress or strain on the progression of arteriosclerotic heart disease. There are established known risk factors which he has detailed in his report. In addition there are possible risk factors, and this would include emotional stress. The amount of stress is very difficult to measure quantitatively when dealing with a specific individual. To summarize, he feels that stress may be a lesser risk factor, and even this is medically disputed by the experts.

" . . . . . . . . . . . . . . . .

"He concedes that a San Francisco medical group, subsequently identified as Dr. Friedman and his association, 'pushes' the idea that stress is a causative factor in the progression of heart disease. The theory of this group includes the concept that emotional stress may aggravate or increase other known risk factors. However, in his opinion there is no good statistical proof of this. In the absence of scientific data to corroborate the stress theory, he would consider stress as a very minor risk factor. However, he concedes that the medical profession just does not know all the answers. . . .

"It is known that arteriosclerosis often starts in early childhood and progresses throughout life.

" . . . . . . . . . . . . . . . . . . .

"He is not aware of any valid medical studies on the possible causative role of intractable pain and worry. In cases of multiple fractures, though, there is no incident of an increase in heart deaths. There is one risk factor which all physicians would agree was a contributing cause to the progression of heart disease, i.e., cigarette smoking, although even here we probably do not know all of the medical mechanism of cigarette smoking and heart disease. He doubts that plaque is actually laid down during smoking because it is known that if one quits smoking, there is statistical improvement from the first day. The more probable mechanism of the role of cigarette smoking would be related to possibly the nicotine effect or vasal constriction or some other mechanism.

" . . . . . . . . . . . . . . . . . . .

"He did review the medical records, and he assumed that decedent was suffering pains secondary to his orthopedic injuries, and this is confirmed by the fact that he was taking medication for pain.

" . . . . . . . . . . . . . . . . . . .

"He assumes that pain would be stressful. Nonetheless, there is no medical evidence that pain increases the incident of heart attacks.

" . . . . . . . . . . . . . . . . . . .

"He expressly distinguishes this type of case [from] a death which occurs from an acute coronary insufficiency after exposure to sudden

unaccustomed physical exertion which he definitely believes would have a causative role."

Dr. Frank again testified and, as reported by Judge Trovillion, said in part: "While there is no study as to the causative role of pain per se, the literature refers to studies dealing with pain on the assumption that pain creates stress. It is obvious to the witness that pain is emotionally stressful, and in his opinion produces neuro-glandular mechanisms in the blood which aggravate or accelerate the underlying disease process."

Dr. Walker, recalled, declared that "the majority opinion of physicians is that stress is not one of the major risk factors in heart disease cases. Most qualifying cardiologists would rate this a possible risk factor only."

On reconsideration of both claims the board accepted the medical opinion of Dr. Walker as based on medical probabilities and rejected the opinion of Dr. Frank as based on theoretical and unproved possibilities. The board found that Lewis's death on 31 July 1972 was not caused, aggravated, or precipitated by his automobile accident in August 1968. It adopted and affirmed Judge Daraban's finding that Lewis's employment subsequent to his accident did not contribute to his death.

### Discussion

In *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, 280-281, the court resolved a stress-induced heart-disease case in favor of the widow and stated four principles of general applicability:

1. ■ Although the employee bears the burden of proving that his injury was sustained in the course of his employment, the established legislative policy is that the Workmen's Compensation Act must be liberally construed in the employee's favor (Lab. Code, § 3202), and all reasonable doubts whether an injury arose out of employment are to be resolved in favor of the employee.

2. ■ Although the board is empowered to resolve conflicts in the evidence, to make its own credibility determinations, and upon reconsideration to reject the findings of the referee and enter its own findings on the basis of its review of the record, nevertheless, any award, order, or decision of the board must be supported by substantial evidence in the light of the entire record. The foregoing standard is not met by simply

isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.

3. ■ As a general rule the board must accept as true the intended meaning of evidence both uncontradicted and unimpeached.

4. ■ When a referee's finding of compensable injury is supported by solid, credible evidence, it is to be accorded great weight by the board and should be rejected only on the basis of contrary evidence of considerable substantiality.

The *Lamb* opinion emphasized that stress need be only a "contributing cause" of death (11 Cal.3d at p. 281) and that the amount of stress "inherent" in a situation is not significant so long as stress has "in fact" been exerted upon the particular workman (11 Cal.3d at pp. 282-283).

■ In analyzing the cause at bench we first observe that it differs procedurally from *Lamb,* in that the board was not merely reviewing the work of its referee or reevaluating evidence that had previously been considered by a referee. On the contrary, the board was evaluating the cause in the first instance, for the evidence before it had never been considered in full by any referee. Judge Daraban heard part of the evidence and made certain findings. Thereafter the board found a need to secure additional evidence, which was subsequently obtained and reported upon by Judge Trovillion. Both reports then came before the board, which thus became the first body to evaluate and pass upon the totality of the evidence. Hence, unlike the situation in *Lamb,* there was no referee's report or finding to be accorded great weight, for no referee had had the opportunity to pass upon the entire evidence. Under Labor Code section 5906 the board possesses specific authority to direct the taking of additional evidence, an authority it exercised in this cause. In view of the controversial nature of the medical issue, the board is to be commended and not faulted for obtaining additional evidence on the medical problem before it. (*Zozaya* v. *Workmen's Comp. Appeals Bd.,* 27 Cal.App.3d 464, 468 [103 Cal.Rptr. 793]; *Solomon* v. *Workmen's Comp. Appeals Bd.,* 24 Cal.App.3d 282, 286 [100 Cal.Rptr. 899].) In this instance the board did so by securing the opinion of a distinguished cardiologist to supplement the two conflicting partisan opinions it already had.

We also note that the facts of the cause were not in dispute and that the testimony of the lay witnesses was accepted by all experts, viz. that subsequent to the time of his accident decedent suffered pain and

discomfort as a result of his injuries until the time of his death. Thus, the sole issue before the board involved the credibility and persuasiveness of the medical testimony offered as expert opinion on the cause of decedent's death, specifically whether the pain attributable to Lewis's earlier orthopedic injuries accelerated and hastened his death. In answering this question the board was required to resolve a difference of opinion on a novel medical issue and to exercise its "long-acknowledged administrative expertise." (*LeVesque* v. *Workmen's Comp. App. Bd.*, 1 Cal.3d 627, 635 [83 Cal.Rptr. 208, 463 P.2d 432].) In this instance the board concluded that decedent's death on 31 July 1972 was not caused, aggravated, or precipitated by his accident in August 1968. The issue pending before us is whether substantial evidence supported the board's order, for we are precluded by statute from exercising our independent judgment on the evidence, and the scope of our review does not extend beyond a determination that the board's order is unsupported by substantial evidence. (Lab. Code, § 5952.)

The novelty of the medical question at issue arises from the origin of the stress said to have aggravated the arteriosclerosis from which decedent died. In other cases the stress found to have caused death from heart disease was work-related, that is to say the stress of the employee's occupation was found to have accelerated his arteriosclerosis. At bench, however, both the first hearing judge and the board specifically rejected the claim that decedent's stress arose from his work. The claim relied upon for compensation was that the pain, disability, and discomfort arising from orthopedic injuries produced stress, which in turn aggravated and accelerated decedent's heart disease. Instead of the usual causative chain, i.e., work produces stress which aggravates heart disease, we have a causative chain asserting that orthopedic injuries produced pain which produced stress which aggravated the heart disease. We are thus dealing with a causative chain one link further extended from direct causation.

On the specific issue whether pain aggravates the progress of heart disease, all medical experts testified that no studies exist suggesting that pain is a cause of the stress that may aggravate heart disease.[1] While

---

[1]Dr. Frank: "I don't know of any publication that would imply, indicate pain per se, just the sensation of pain as being a factor responsible for causing or aggravating coronary heart disease."

Dr. Markovitz: "Dr. Frank's theory is speculative and is not based upon facts."

Dr. Walker: "He is not aware of any valid medical studies on the possible causative

respectable medical theory supports the thesis that stress causes heart disease, this theory is sharply disputed, and, unlike the relationship of cigarette smoking and heart disease, the relationship of stress and heart disease remains a theoretical rather than a demonstrative aspect of physiology. In certain legal decisions since *Lamb,* acceptance of the theory that a relationship exists between stressful occupation and acceleration of arteriosclerosis, has virtually been elevated to a matter of common or judicial knowledge. (See e.g.·, *Turner* v. *Workmen's Comp. Appeals Bd.,* 42 Cal.App.3d 1036, 1043 [117 Cal.Rptr. 358]; see also *Greenberg* v. *Workmen's Comp. Appeals Bd.,* 37 Cal.App.3d 792, 798-799 [1·12 Cal.Rptr. 626]; *Stephens* v. *Workmen's Comp. Appeals Bd.,* 20 Cal.App.3d 461, 467 [97 Cal.Rptr. 713].) These decisions accept the premise that the contribution of stressful occupation to heart disease is neither infrequent in incidence nor insubstantial in effect. The Legislature has likewise adopted the theory that certain stressful occupations are presumed to. be a causative factor in heart disease and that the disease thus presumptively arises from the employment. (Lab. Code, §§ 3212 (police and firemen), 3212.2 (custodial officers), 3212.3 (state police), 3212.4 (campus firemen), 3212.5 (highway patrol), 3212.6 (law enforcement investigators), 3212.7 (other peace officers), 3213 (campus policemen).) In determining compensation cases under such statutes, the courts have operated on the basis of legal attribution rather than strict medical causation. Yet in these instances both judicial decisions and legislative enactments limit their scope to stress arising as a consequence of stressful employment. In sharp contrast to the foregoing the claim at bench relies on stress arising, not from work, but from pain, disability, and discomfort. This is a novel theory, in effect, the imposition of a theory on a theory, whose acceptance would greatly expand the scope of causation of arteriosclerosis. Yet at the moment we possess no medical or scientific knowledge that pain aggravates and accelerates heart disease. It is plausible to theorize that it does, for we know from common experience that pain is apt to be tiring and debilitating. On the other hand, at times pain serves a positive function, and it is equally plausible to theorize that pain restrains a person from pushing himself beyond his limits and thereby prolongs the life of a person with heart disease. Neither theory is a matter of scientific knowledge or inference. On this point neither speculative opinion nor common-sense generalization is conclusive, and our knowledge of the relationship of pain and heart disease is no further advanced than medicine's 19th century view that marsh gas was the cause of malaria.

---

role of intractable pain and worry. In cases of multiple fractures, though, there is no incident of an increase in heart deaths."

We are not required to resolve this problem of medical etiology, for our task is merely to determine whether the board's decision is unsupported by substantial evidence. On the point at issue the testimony of Dr. White squarely supports the decision of the board. While Dr. White, together with majority medical opinion, may eventually be proved wrong, that opinion at least qualifies as substantial evidence which justifies the board in rejecting an unproved, novel medical theory on the causation of coronary atherosclerosis.

The board's orders are affirmed.

Compton, J., and Beach, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied May 26, 1976.