[Civ. No. 33762. Second Dist., Div. One. June 4, 1969.]

LOUELLA FONTNO et al., Petitioners, v. WORKMEN'S COMPENSATION APPEALS BOARD, COUNTY OF LOS ANGELES et al., Respondents.

Lemaire, Mohi, Morales & Dumas and Gary Mohi for Petitioners.

Everett A. Corten, Sheldon M. Ziff and Arthur C. Jones for Respondents.

FEINERMAN, J. pro tem.*—The dependents of a deceased employee seek review and annulment of a decision of the Workmen's Compensation Appeals Board which denied their claims for death benefits.

On January 31, 1967, at approximately 9 p.m. decedent, a 46-year-old senior custodian foreman of the Building Services Department of Los Angeles County, was driving a car in the course of his employment when the car collided with the curb of the street, swung to the right down a 30-foot embankment, struck a fence, and settled on end in a parking lot below. He was taken to the receiving hospital where he was pronounced dead on arrival.

An autopsy report ascribed death to occlusive coronary arteriosclerosis. The report noted that decedent's heart was greatly enlarged with a marked degree of myocardial fibrosis (scar tissue) including an extensive area in the posterior wall of the left ventricle; that the coronary arteries revealed a marked degree of atherosclerosis with calcification and obliteration of the lumens by atheromatous process to the extent of 80 percent in the anterior descending, 60 percent in the left circumflex and 90 percent in the right main arteries; and that there was present a moderate bilateral congestion in the respiratory system and a moderate acute passive congestion of the hepatic system.

Petitioners claimed compensation on the alternative theories that death was the result of artery disease and heart damage which had been caused or accelerated by the cumulative stress of decedent's work for the county from 1950 to the date of death, or that death was the result of the aggravation and acceleration of the disease and heart damage by the stress at work on the date of death.

The uncontradicted testimony of a payroll clerk, a custodian foreman who worked under decedent, and the widow established the following facts: Decedent entered county service on or about November 1, 1950, as a custodian in the building and services department. On at least one occasion he was passed over for promotion. The unit in which he worked was transferred to the Bureau of Public Assistance, and in time he was promoted to the position of senior custodian foreman in which position he supervised some 57 employees working in widely separated county facilities. His regular assignment was from 4:30 p.m. to 12:30 a.m. He was required to drive in excess of 1,200 miles per month between facilities. He often

*Assigned by the Chairman of the Judicial Council.

went to work and meetings relating to his work as early as 9 or 10 o'clock in the morning and he did most of his reports outside of his regular 8-hour shift. His work entailed the demonstration to employees of how to do various jobs and use equipment as well as the supervision of low-skilled employees.

On January 1, 1967, there was a merger of the maintenance services to which decedent had been assigned in the Bureau of Public Assistance into the Building and Services Department. For six months prior to the merger, the decedent had been upset and worried over the potential consequences of the merger on his position. After the merger he had retained the same salary and title, but there remained some uncertainty as to the exact assignment he would have. He was required to do an increased amount of paper work in the inventory of equipment and other matters involved in combining the two services. He learned that he was being observed by an efficiency expert. His driving was reduced to approximately 600 to 700 miles during the month of January.

From July 1966 until the date of his death, decedent lost 10 to 15 pounds. He complained of fatigue, ''fuzzy'' headaches, shortness of breath, and little pains in the shoulder and through the chest. He became pale and his skin was drawn. He was treated by a doctor who prescribed diathermy and shots for bursitis. He had been treated for an ulcer in 1960. About one-half hour before his death, he learned that the foreman who had worked under him since 1957 was to be transferred and he appeared visibly agitated.

The medical experts agreed that decedent had a serious coronary artery disease and had apparently suffered prior myocardial infarctions which damaged his heart, but that he had not suffered a thrombosis or myocardial infarction on the date of his death. Dr. Dimitroff testified that medical science does not know what causes arteriosclerosis. He declared, however, that there are some predictive factors such as family history, hypertension, diabetes, and excessive cigarette smoking which may contribute to the disease, but he alleged that stress or strain is not one of them. The doctor conceded, nevertheless, that if stress is overwhelming, it might have an effect on an already damaged heart. He stated that even if stress contributed, the degree of stress arising from decedent's anxieties over the merger of the maintenance services was not sufficient to do so. As to the cause of death, it was his opinion that blood flow to the heart was insufficient and that death could have been due to arrhythmia, heart block, shock

or congestive failure, but he could not say what was the immediate mechanism causing death.

Dr. Tuchman testified that it was his opinion that from approximately July 1966 to the date of death the daily stresses of decedent's work and the long hours that he worked aggravated and accelerated the progressive arteriosclerosis and thereby hastened death. On the basis of the autopsy report of fibrosis or scarred areas in the heart, he expressed the opinion that applicant had suffered myocardial infarctions at times past. He could not say when they occurred except that none had occurred in the six to nine weeks prior to death, inasmuch as the scars were fully healed. As to the immediate mechanism which precipitated death, the doctor stated that decedent probably had an arrhythmia, which is more apt to occur where the heart has been damaged and scarred, and that he should have had a more moderate type of work activity and more rest for some time prior to his death.

The referee, in reliance on the opinion of Dr. Tuchman, issued findings and award on both the cumulative and specific claims. The appeals board granted respondents' petition for reconsideration and referred the matter to Dr. Kalmansohn, an independent medical examiner. In a written report, he expressed the opinion that the cause of the death was extensive coronary arteriosclerosis and resultant myocardial disease and that the immediate mechanism which caused death could have been a coronary arrhythmia, shock, severe coronary insufficiency or congestive heart failure. He stated that it was impossible to say for sure what the immediate cause of death was, but that it was highly unlikely that stress or strain could have contributed to any one of these immediate causes, particularly in view of the fact that the stress was not an acute severe type of stress. His report concluded that he could see no relationship between the decedent's work and the underlying disease or the acute episode which was responsible for his death.

A hearing was granted to the petitioners to cross-examine Dr. Kalmansohn and to present rebuttal evidence. Dr. Kalmansohn testified that there is no proven relationship between mental stress and heart disease and that the mental stress or emotions of the decedent prior to the date of death played no part in aggravating or causing any problem with his heart. He stated that the only exception would be in the case of severe acute distress, such as fear for one's life in a holdup. He further stated that physical activity may be desirable for

an individual who suffers coronary artery disease, as it may build up collateral vessels and improve circulation to the heart muscle, and he expressed the opinion that the physical activity of the decedent on his job was definitely not deleterious.

Petitioners' counsel introduced a police report of the automobile accident which reflected the statement of an eyewitness to the effect that the car driven by decedent made a right-hand turn down the embankment in a smooth motion. Petitioners' counsel asked the doctor if he had an opinion as to when in the course of the events the critical heart difficulty occurred. The doctor stated: "No, I couldn't. I couldn't be sure which is the cart and which is the horse. I don't know whether he had an acute episode of heart disturbance which caused him to go down the embankment, or whether his going down the embankment caused him to have heart trouble. I don't know whether anyone will be able to solve that problem. I'm not sure I have in mind the whole sequence of the accident clearly, but the fact he didn't hit another automobile and just rolled down an embankment would suggest that he might have had a heart episode first." However, the doctor further testified that the particular circumstances were in his opinion sufficiently stressful to aggravate a heart condition such as the decedent suffered and to bring about his demise. Defense counsel then inquired if his opinion remained exactly the same as when he wrote his report, and the doctor replied that it did.

In rebuttal, Dr. Tuchman agreed that the demise could have been caused by cardiac arrhythmia, shock, severe coronary insufficiency, or congestive heart failure as Dr. Kalmansohn had stated in his report, or by a combination of several of these factors. He repeated his opinion that both the mental and physical strain of decedent's employment contributed to and hastened his death and added that the automobile accident probably played a part. He was of the opinion that decedent probably had a cardiac arrhythmia, that he could well have had a nonfatal arrhythmia, and that the fear, panic and shock on seeing himself go down the hill aggravated it into a final fatal arrhythmia. He noted that circulation was proceeding forward, at least moments before, to produce bleeding into tissues. However, he too conceded that he could not say where death occurred in time and space.

The opinion of the appeals board sets forth, pursuant to Labor Code section 5908.5, the evidence relied upon and the

reasons for its decision as follows: ''The matter was referred to Doctor Kalmansohn as an Independent Medical Examiner and the doctor's report was admitted into evidence on June 6, 1968. Doctor Kalmansohn, reporting on April 5, 1968, was forced to conclude that (he) 'can see no relationship between the patient's work and the underlying coronary disease or the acute episode which was responsible for his death.' The doctor stated that the decedent had 'extensive long standing coronary artery disease and associated heart disease with an extensive left ventricular hypertrophy.' The doctor attributed the death to this 'extensive coronary artery disease and resultant myocardial disease. . . .' Doctor Kalmansohn testified that in his opinion the physiological response to mental stress is not significant as a cause of death unless the stress is of an acute or severe type. He did not feel it was possible to establish a definite relationship between continuous, but less severe, stress and the death. The doctor stated that his opinion as set forth in his report of April 5, 1968, was unchanged.

''Leopold S. Tuchman, M.D., when he testified on December 15, 1967, emphasized the emotional stress as a cause of the employee's death. At the hearing of August 6, 1968, Doctor Tuchman opined that the automobile accident in which the decedent was involved might also have played a part in his demise.

''We are persuaded by the entire record herein as supplemented that applicant [sic] did not sustain injury which led to his death on January 31, 1967 either on that date or as a result of his employment beginning November 1, 1950 through that date.''

The record indicates that the appeals board chose to rely on the opinion of Dr. Kalmansohn that the decedent did not sustain cumulative injury to his heart as a result of the emotional stress arising out of and occurring in the course of his routine work activities or those relating to the merger of the departments. It is not clear, however, upon what evidence the board relied or what its reason was for its conclusion that the automobile accident was not a factor which hastened death. Pursuant thereto, we have concluded that the board has failed to meet the requirements of Labor Code section 5908.5 in deciding that issue.

Petitioners, citing the case of *Clemmens* v. *Workmen's Comp. App. Bd.*, 261 Cal.App.2d 1 [68 Cal.Rptr. 804], contend that since none of the medical experts could say what the immediate mechanism was that caused decedent's heart to col-

lapse, they were entitled to a presumption or inference that decedent's death arose out of his employment. The position of the appeals board is that the circumstances raised conflicting inferences as to the immediate cause of death and in such case the appeals board's decision on a question of fact is final.

 Whether the employment proximately causes or accelerates a disease process or precipitates the collapse of a heart from preexisting disease before normal progressive developments would have resulted in its collapse is a question of fact for the determination of which the appeals board must necessarily depend on the reasoned opinion of experts. (See *Liberty Mut. Ins. Co. v. Industrial Acc. Com.*, 73 Cal.App.2d 555, 559-560 [166 P.2d 908] and cases cited therein.)

In the *Clemmens* case, *supra*, an electrical engineer was found dead near an electrical instrument which he had intended to inspect. The instrument was low voltage and low amperage except at terminal points where the voltage was from 115 to 220 volts. There was evidence that it was possible to come into contact with these terminals but that it would be improbable to so do. An autopsy revealed that the decedent's heart was in good condition and his body reflected no electrical harm or contact marks. The autopsy report ascribed death to diabetes mellitus. There was a great diversity of medical opinion as to the probable cause of death. An award was denied by the board on a finding that decedent died from a cause or causes which had not been determined. On review, the decision was annulled and the cause remanded to the appeals board to resolve the conflicting evidence and make a finding as to the cause of death. In its opinion the court emphasized that "the board is bound, as are the courts, 'by the fundamental principle that to effectuate the purposes of the compensation statute, all reasonable doubts as to whether an injury is compensable are to be resolved in favor of the employee.'" (Citing *California Comp. & Fire Co. v. Workmen's Comp. App. Bd.*, 68 Cal.2d 157, 161 [65 Cal.Rptr. 155, 436 P.2d 67]).

In the *Clemmens* decision, *supra*, the court quoted extensively from 1 Larson, Workmen's Compensation Law (pp. 108-113) and considered the California cases which appeared to indulge a presumption or inference that death was work-related where the exact circumstances of death were unknown. The court concluded that in a case where an employee is found dead under circumstances indicating that death took place within the time and space limits of the employment and

the character of the harm is neither obviously work related nor obviously idiopathic, no inference arose of either industrial or nonindustrial causation. The court also noted that the failure of the board to weigh the conflicting medical evidence had imposed an impossible burden of proof on the petitioner.

The present case raises a somewhat different problem. Here the employee was found dead under circumstances indicating that death took place within the time and space limits of the employment. The medical experts agreed that he had a serious heart condition which could have, without the contribution of stress or strain, progressed to an acute episode of heart failure, or cardiac arrhythmia, or insufficiency which, in turn, could have proved fatal. The medical experts also agreed that acute mental distress or shock could have brought on such an acute episode. The unresolved question then is whether the decedent encountered in the course of his employment acute mental distress or shock, causing collapse of the heart, or the heart simply collapsed from the normal progress of disease.

■ On the facts presented in this case, we believe we are also bound by the principle articulated in *California Comp. & Fire Co.* v. *Workmen's Comp. App. Bd.*, *supra*. As applied herein, this means that where medical experts are unable to express an opinion as to the stimulus or operating mechanism that triggered the death because the circumstances in which the death occurred do not establish sufficient criteria upon which they may base their medical opinions, and death occurs within the time and space limits of the employment, and the medical experts agree that the shock of the accident could have brought on an acute episode of heart failure or cardiac arrhythmia, all reasonable doubts are to be resolved in favor of the employee and the death shall be deemed to have arisen out of the employment and be compensable.

Although the petitioners have filed two separate claims, one for cumulative injury and one for specific injury, the medical evidence overlaps and relates to both claims. For this reason, it appears that the claims were consolidated for hearing and the appeals board in its opinion on decision treated the two claims together.

The order under review is annulled as to both claims filed and the Workmen's Compensation Appeals Board is directed to take further proceedings in this matter in accordance with the views expressed in this opinion.

Lillie, Acting P. J., and Thompson, J., concurred.