[S.F. No. 23338. Sept. 13, 1978.]

CITY AND COUNTY OF SAN FRANCISCO,
Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
ANNETTE WIEBE et al., Respondents.

## COUNSEL

Thomas M. O'Connor, City Attorney, and Donald J. Garibaldi, Deputy City Attorney, for Petitioner.

Burt Pines, City Attorney (Los Angeles), John T. Neville, Assistant City Attorney, and Mary E. McDaniel, Deputy City Attorney, as Amici Curiae on behalf of Petitioner.

George J. Engler, T. Groezinger, James J. Vonk, George S. Bjornsen and Robert A. La Porta for Respondents.

Lewis & Marenstein and James Kadar as Amici Curiae on behalf of Respondents.

## OPINION

**TOBRINER, J.**—For nearly forty years, Labor Code section 3212.5 has provided that when a police officer who has been employed for five or more years develops "heart trouble," the condition is presumed, subject to rebuttal, to have arisen out of and in the course of his employment and thus to be compensable under the workers' compensation law. In 1959, the Legislature amended the section to provide that an employer may not rebut section 3212.5's presumption, and thus may not defeat an ailing police officer's workers' compensation claim, on the basis of evidence attributing the officer's heart trouble to a preexisting heart disease.[1] Although the 1959 amendment has been applied regularly by both the Workers Compensation Appeals Board (WCAB) and the California courts for almost two decades, in the instant case the City and County of San Francisco (hereafter employer) contends that this portion of the statute is invalid under distinct provisions of both the California and the

---

[1]Section 3212.5 presently provides in relevant part: "In the case of a member of a police department of a city or municipality . . . , when any such member is employed upon a regular, full-time salary, . . . the term 'injury' as used in this division includes heart trouble and pneumonia which develops or manifests itself during a period while such member, sheriff, or deputy sheriff, inspector or investigator is in the service of the police department . . . . The compensation which is awarded for such heart trouble or pneumonia shall include full hospital, surgical, medical treatment, disability indemnity, and death benefits as provided by the provisions of this division.

"Such heart trouble or pneumonia so developing or manifesting itself shall be presumed to arise out of and in the course of the employment; provided, however, that the member of the police department . . . shall have served five years or more in such capacity before the presumption shall arise as to the compensability of heart trouble so developing or manifesting itself. This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance with it. This presumption shall be extended to a member following termination of service for a period of three calendar months for each full year of the requisite service, but not to exceed 60 months in any circumstance, commencing with the last date actually worked in the specified capacity.

"*Such heart trouble or pneumonia so developing or manifesting itself in such cases shall in no case be attributed to any disease existing prior to such development or manifestation.*

"The term 'members' as used herein shall be limited to those employees of police departments, the California Highway Patrol and sheriffs' departments and inspectors and investigators of a district attorney's office who are defined as peace officers in Section 830.1, 830.2, or 830.3 of the Penal Code."

The 1959 amendment added the emphasized paragraph to the statute, and it is only this paragraph which is challenged in the instant case.

United States Constitutions. As we explain, we find no merit in the employer's constitutional contentions and accordingly we affirm the WCAB award.

### 1. *The facts*

Leonard F. Wiebe joined the San Francisco Police Department on July 13, 1943, and served on the police force for more than 25 years, retiring on November 16, 1968. On September 3, 1972, Wiebe collapsed while shopping and died shortly thereafter, the victim of a massive heart attack. The city acknowledges that Wiebe's heart attack "developed and manifested itself" within five years of his retirement and concedes that, if section 3212.5 is constitutional, the officer's wife and child are entitled to invoke the benefits afforded by that provision. (See fn. 1, *ante.*)

Following Wiebe's death, his wife and daughter filed a workers' compensation application for death benefits and burial expenses. The employer contested the claim, arguing that Wiebe's heart attack was not in any way related to his lengthy employment with the city police department. In support of this contention, the employer offered a medical report and testimony of Dr. Frederic Mintz, a cardiovascular specialist employed by the city as an expert witness.

Although Dr. Mintz apparently had no knowledge of, and made no inquiry into, the details of the decedent's 25 years of police employment, Dr. Mintz concluded, after reviewing the decedent's medical records, that "I cannot . . . on medical grounds reasonably relate his coronary heart disease and myocardial infarction to his employment as a police officer. . . ." Dr. Mintz's report reveals that his conclusion was not based on any peculiarity of Wiebe's heart attack, but rather rested on the doctor's general academic medical opinion that job stress and exertion do not play a causal role in the development or progression of coronary heart disease.[2] On the basis of Dr. Mintz's opinion, the employer contended that the WCAB should deny the claimed workers' compensation benefits.

---

[2]Dr. Mintz' report states in pertinent part:

"It is concluded that Mr. Wiebe died of an acute myocardial infarction secondary to coronary atherosclerotic disease. This disease is progressive and had undoubtedly been present for many years prior to his demise. In fact, autopsy studies have shown that coronary atherosclerosis is well established in most American males by the age of 25. Coronary occlusion and subsequent myocardial infarction are common inherent incidents in the natural life history of the progressive coronary atherosclerotic process.

"The role of type of occupation, emotional distress, length of hours of work and

The Wiebes, apparently satisfied that section 3212.5's statutory presumption of work-relatedness had not been rebutted, presented no contrary medical evidence on their behalf, and the WCAB, rejecting the employer's constitutional attack on section 3212.5, concluded that under that section Dr. Mintz's testimony was insufficient to defeat the Wiebes' workers' compensation claim. Accordingly, the WCAB awarded the Wiebes the statutorily authorized death benefit and burial expenses.

The employer now seeks annulment of the WCAB award, contending that the 1959 amendment to section 3212.5, upon which the WCAB relied, is unconstitutional in two respects. First, the employer argues that in adopting the 1959 amendment, the Legislature exceeded the constitutional authority to enact workers' compensation legislation afforded by article XIV section 4 of the California Constitution. Second, the employer maintains that, in any event, the 1959 amendment constitutes an impermissible conclusive presumption violative of federal due process guarantees. After setting forth the legislative history and purpose of the challenged statutory provision, we discuss each of the employer's contentions in turn.

2. *The legislative history and purpose of the 1959 amendment to section 3212.5.*

To analyze properly the city's constitutional claims, we must at the outset place the 1959 amendment to section 3212.5 in context by identifying the serious problem at which the legislation was directed. That problem, widely recognized in both the legal literature and the case law as "probably the most prolific and troublesome problem in workmen's compensation law" (Larson, *The "Heart Cases" in Workmen's Compensation: An Analysis and Suggested Solution* (1967) 65 Mich.L.Rev. 441, 441), arises from "the persisting cleavage in medical theory itself"

behavior pattern in the pathogenesis of coronary heart disease must be regarded as conjectural. One may be highly critical of the evidence adduced to support a causal relation between emotional factors and coronary heart disease. The extremely low incidence of the disease in various parts of the world during periods of war stress when adequate food was unavailable, the high frequency in this country among people of all economic means, all types of jobs and all personalities precludes a primary role of emotion or occupation.

"In summary, it is my opinion that the deceased died of an acute myocardial infarction as the result of coronary atherosclerotic heart disease. I cannot, however, on medical grounds reasonably relate his coronary heart disease and myocardial infarction to his employment as a police officer. . . ."

(*id.,* at p. 475) as to the relationship between stress, physical exertion and progressive heart disease.[3]

Some doctors, like Dr. Mintz, who testified on behalf of the employer in the instant case, hold to the view that emotional stress and physical exertion normally do not contribute in any way to the development or progression of coronary arteriosclerosis and accordingly believe that heart attacks resulting from such progressive heart disease generally bear no relation to employment activities, even when such employment entails considerable stress or exertion. Many medical experts, however, subscribe to the contrary view that emotional stress and physical exertion do contribute to and aggravate the development and progression of arterio-sclerosis, and these physicians consequently believe that employment conditions which subject an individual to considerable stress and physical exertion do hasten the development of such heart disease and thus are contributing causative factors in any ultimate heart attack that results from the progression of such preexisting heart disease.

For many years, this split in medical opinion upon one of the most commonly litigated issues in workers' compensation matters has seriously undermined the efficacy, consistency and basic fairness of the WCAB's normal case-by-case determination of the work-relatedness of an employee's injury or illness. As one commentator has pointed out, "the overwhelming majority of the cases in this area involve conflicts in medical testimony, and it is not unusual to see one doctor appearing frequently on the side of employers while another doctor is often visible as a plaintiff's expert. *Regardless of the factual setting,* the employer's doctor *invariably* determines that the death or injury is entirely due to the pre-existing disease and is not work-related while the plaintiff's expert *continuously* finds the problem to have been precipitated by stress of the job. Since the ultimate decision as to whether or not the employment contributed to the harm is a question of fact for the determination of the Appeals Board, and the testimony of any single doctor is generally sufficient to sustain the findings of the Board, the result in a particular

---

[3]See generally IA Larson, The Law of Workmen's Compensation (1973) section 38.83, pages 7-192 to 7-202 and cases cited; Note, *Workmen's Compensation—Diseases Arising Out of Employment—A Problem of Proof* (1971) 2 Pacific L.J. 678 (hereinafter Note, *A Problem of Proof*); *Lewis* v. *Workers' Comp. Appeals Bd.* (1976) 56 Cal.App.3d 938, 951-953 [128 Cal.Rptr. 752]; *Stephens* v. *Workmen's Comp. Appeals Bd.* (1971) 20 Cal.App.3d 461, 465-468 [97 Cal.Rptr. 713]; *Dwyer* v. *Ford Motor Co.* (1962) 36 N.J. 487, 513-516 [178 A.2d 161] (Weintraub, C. J., conc.).

case cannot be anticipated." (Italics added, fns. omitted.) (Note, *A Problem of Proof, supra,* 2 Pacific L.J. 678, 689-690.)

In light of the division in medical theory on this crucial issue, the Legislature thus faced a situation in which the fate of an individual worker's claim generally did not turn on the facts of his particular employment or heart attack, but rather was decided almost fortuitously on the basis of which of the two competing schools of medical thought *the lay referee or appeals board* decided to endorse in the particular case.[4] Indeed, given the split in medical opinion it was not unusual to find referees and the WCAB arriving at contradictory conclusions on the work-relatedness of a heart attack in cases involving virtually indistinguishable facts. (See Note, *A Problem of Proof, supra,* 2 Pacific L.J. 678, 690-691.) Moreover, inasmuch as the records in such cases almost invariably contained substantial evidence to support either the conclusion that employment stress and exertion had aggravated the employee's disease or that it had not, the availability of judicial review provided no remedy for the manifest unfairness implicit in this situation.

In the original version of Labor Code section 3212.5, enacted in 1939, the Legislature attempted to ameliorate this problem of proof with respect to one class of employees simply by providing a rebuttable presumption that "heart trouble" incurred by local police officers who had served for·five or more years arose out of and in the course of their employment. (Stats. 1939, ch. 627, § 1, p. 2047.) In succeeding years the Legislature expanded the reach of the rebuttable presumption of section 3212.5 to other law enforcement officials (see, e.g., Stats. 1943, ch. 255, § 1, pp. 1168-1169; Stats. 1955, ch. 797, § 2, pp. 1399-1400), but by 1959 the Legislature had recognized that, with respect to the issue of preexisting heart disease, the extant provisions of section 3212.5 were not

---

[4]In discussing these problems in its 1965 report, the legislatively created Workmen's Compensation Study Commission observed that "[t]he absence of a set of medical directives or policy has resulted in certain evils. There is uncertainty as to the ultimate determination of such cases for both the injured and the employer. This results in litigation, which in turn hinders a recovery and is adverse to the primary goal of rehabilitation. *There is a lack of uniformity as to the interpretation of a given case, and there is always the danger that various referees will adopt positions which are inconsistent with one another.* [¶] There also can be an unfair and discriminatory distribution of benefits, resultant to the absence of a guiding policy. *Mere coincidental factors may result in the individually different determinations of compensability even though the cases may present identical conditions and disabilities.*" (Italics added.) (Workmen's Comp. Study Com., 1965 Rep., pp. 118-119.)

adequate to alleviate the problem of inconsistent decisions resulting from the continuing conflict in medical authority.

Through hindsight, the inadequacy of the pre-1959 rebuttable presumption in this context is readily apparent. Under the pre-1959 version of section 3212.5, if a police officer with five or more years of experience suffered a heart attack, it was presumed that the heart trouble arose out of his employment, and, *in the absence of any contrary evidence introduced by the employer,* the WCAB was obliged to find the injury compensable. Whenever the employer came forward with evidence suggesting that the heart attack was not work related, however, the effect of the statutory presumption disappeared (see *McCutcheon* v. *Workmen's Comp. Appeals Bd.* (1968) 33 Cal.Comp.Cases 261, 262-263), and the WCAB was then compelled to resolve the continuing medical dispute on a case-by-case basis much as it had attempted to do so futilely in the past. Since, as we have noted, there was no shortage of medical experts who subscribed to the view that employment-related stress and exertion play no role in the development of progressive heart disease, employers had no difficulty in producing medical testimony in virtually all cases that a heart attack sustained by a worker who suffered from a preexisting disease was not work related. Thus, in its pre-1959 state, section 3212.5 failed to alleviate the gross inequities and unfairness which flowed from the inevitable and inconclusive "battle of the experts" in preexisting heart disease cases.

It was to this serious and continuing "evil" or "mischief" that the 1959 amendment of section 3212.5 was directly addressed. In order to eliminate the repeated and unilluminating battle of experts with respect to the preexisting heart disease issue and to provide consistency in treatment to similarly situated injured workers, the Legislature amended section 3212.5 to preclude the WCAB from finding the statutory work-related presumption rebutted solely on the basis of evidence attributing the heart attack to a preexisting disease. (Stats. 1959, ch. 758, § 2, pp. 2745-2746, quoted in fn. 1, *ante.*)

In light of the employer's wide-ranging attack on the provision, discussed below, we emphasize the rather modest reach of the 1959 amendment at issue here. First, although the inconclusive medical debate may well have justified a broad rule applicable to heart attacks suffered by employees generally, the legislation in question here is confined to police officers who had been employed *for five or more years,* assuring

that the employees who receive the benefit of this statutory provision have indeed lived with the considerable stress and exertion of a policeman's job for a substantial period of time. Second, the 1959 amendment does not guarantee even these employees that they will recover workers' compensation benefits for a heart attack which occurs during the course of their employment, but leaves the employer free to rebut the statutory presumption by proving that some contemporaneous nonwork-related event—for example, a victim's strenuous recreational exertion—was the sole cause of the heart attack. (See, e.g., *Turner* v. *Workmen's Comp. App. Bd.* (1968) 258 Cal.App.2d 442, 449 & fn. 7 [65 Cal.Rptr. 825].) Thus, only in the realm of preexisting heart disease, in which the split in medical authority renders consistent case-by-case decision-making virtually impossible, does the 1959 amendment intervene to protect employees from being denied workers' compensation benefits on the basis of a medical theory upon which the medical profession itself is divided.

3. ▮▮▮ *The Legislature did not exceed its constitutional authority in enacting the 1959 amendment to section 3212.5.*

As noted above, the employer initially argues that in enacting the 1959 amendment to section 3212.5 the Legislature exceeded the "grant of authority" which the city contends is accorded the Legislature by article XIV section 4 of the California Constitution. This argument rests initially on the premise that the Legislature's power to enact legislation in the workers' compensation field derives solely from the provisions of article XIV section 4. Building on this premise, the employer asserts that under the terms of article XIV section 4, the Legislature is specifically authorized to adopt only such legislation as permits an employee to recover workers' compensation benefits for a work-related injury or illness. Finally, the employer concludes that the 1959 amendment to section 3212.5 falls outside this constitutional grant of authority, reasoning that the legislation, by precluding an employer from defending a workers' compensation claim on the basis of evidence of preexisting disease, may have the effect of requiring employers to pay compensation benefits for some heart ailments that are not "in fact" work related. As we shall explain, the employer's argument is riddled with a host of fundamental constitutional misconceptions.

To begin with, the employer's claim that the Legislature's authority to enact workers' compensation legislation derives solely from, and is

limited by the specific authorizing language of, article XIV section 4 ignores the fundamental proposition that, unlike the federal Constitution, "[t]he Constitution of this State is not to be considered as a grant of power, but rather as a restriction upon the powers of the Legislature; and that it is competent for the Legislature to exercise all powers not forbidden by the Constitution of the State, or delegated to the [federal] government, or prohibited by the Constitution of the United States." (*People* v. *Coleman* (1854) 4 Cal. 46, 49; see, e.g., *Sheehan* v. *Scott* (1905) 145 Cal. 684, 686-687 [79 P. 350]; *Collins* v. *Riley* (1944) 24 Cal.2d 912, 915-916 [152 P.2d 169]; *Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811].)

■ As our court explained nearly a half century ago, "[W]e do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited. In other words, unless restrained by constitutional provision, the legislature is vested with the whole of the legislative power of the state." (*Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 [57 P.2d 510].) Moreover, the governing authorities additionally establish that "[i]f there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations are to be construed strictly, and are not to be extended to include matters not covered by the language used." (*Collins* v. *Riley, supra,* 24 Cal.2d at p. 916.)

■ Nothing in article XIV section 4 purports to restrict the Legislature's power to enact legislation in the manner suggested by the employer. The initial sentence of article XIV section 4, upon which the employer relies, declares in relevant part: "The Legislature is hereby expressly vested with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability . . . incurred or sustained by . . . said workers in the course of their employment, irrespective of the fault of any party."[5]

---

[5]Article XIV, section 4 provides in relevant part: "The Legislature is hereby expressly vested with plenary power, unlimited by any provision of this Constitution to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment,

While this provision clearly acknowledges and endorses the Legislature's authority to provide for employer-financed compensation of work-related injuries and illnesses, absolutely nothing in this section purports to limit the Legislature's authority to enact additional appropriate legislation for the protection of employees. Moreover, the ballot arguments supporting this constitutional provision when the measure was adopted in 1918 make it clear that the purpose of the provision was simply to remove any doubt as to the constitutionality of the existing workers' compensation legislation, and not to erect any new restrictions on the exercise of legislative power. (See *Mathews* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 733-734, fn. 11 [100 Cal.Rptr. 301, 493 P.2d 1165] (quoting ballot arguments).)

Thus, insofar as the city's constitutional claim rests on the allegedly limited "authorizing language" of article XIV section 4, the contention is clearly without merit. Even without such specific authorization, the Legislature possesses the authority, under the now firmly established view of the concept of the police power, to adopt appropriate legislative measures for the protection of employees and their dependents. (See, e.g., *Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 694-701 [151 P. 398]; *In re Twing* (1922) 188 Cal. 261, 262-263 [204 P. 1082]; *Cal. Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 295-299 [140 P.2d 657, 147 A.L.R. 1028]. See also Cal. Const. art. XIV § 1 ("The Legislature may provide for . . . the general welfare of employees. . . .").)

irrespective of the fault of any party. A complete system of workers' compensation includes adequate provisions for the comfort, health and safety and general welfare of any and all workers and those dependent upon them for support to the extent of relieving from the consequences of any injury or death incurred or sustained by workers in the course of their employment, irrespective of the fault of any party; . . . and full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character; all of which matters are expressly declared to be the social public policy of this State, binding upon all departments of the State government.

"The Legislature is vested with plenary powers, to provide for the settlement of any disputes arising under such legislation . . . by an industrial accident commission, . . . , and may fix and control the method and manner of trial of any such dispute, the rules of evidence and the manner of review of decisions rendered by the tribunal or tribunals designated by it; provided, that all decisions of any such tribunal shall be subject to review by the appellate courts of this State. . . .

"Nothing contained herein shall be taken or construed to impair or render ineffectual in any measure the creation and existence of the industrial accident commission of this State or the State compensation insurance fund, the creation and existence of which, with all the functions vested in them, are hereby ratified and confirmed."

Furthermore, even if the scope of the Legislature's power were measured by the authorizing language of article XIV section 4, the 1959 amendment to section 3212.5 would unquestionably fall well within the bounds of appropriate legislative action. As we have already seen, the initial sentence of article XIV section 4 affirms the legislative prerogative in the workers' compensation realm in broad and sweeping language, declaring that: "The Legislature is hereby expressly vested *with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation,* by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by said workers in the course of their employment, irrespective of the fault of any party." (Italics added.) Moreover, section 4 goes on to specifically provide that the Legislature's "plenary power" in this realm includes the power to "fix and control the method and manner of trial of any such dispute [and] the rules of evidence [applicable to] the tribunal or tribunals designated by it" and, quite significantly, also declares that the broad legislative power should be exercised "to the end that the administration of [the workers' compensation] legislation shall accomplish substantial justice in all cases expeditiously, inexpensively and without incumbrance of any character. . . ."

As is evident from our earlier discussion of the legislative history and purpose of the 1959 amendment to section 3212.5, the Legislature adopted this provision precisely with the constitutionally sanctioned objectives in mind. As we have seen, the cleavage in medical opinion as to the causal relationship between job stress, exertion and progressive heart disease had led to a situation in which "substantial justice" and equal treatment were widely thwarted in practice because the compensability of similar heart attacks varied fortuitously on the basis of which competing school of medical thought administrative officials and lay referees chose to credit in a particular case.

Having in mind that, under traditional principles, a disability that is in part attributable to a preexisting disease is nonetheless compensable so long as a worker's employment played *any* contributing role in either aggravating the progressive heart disease or in hastening the occurrence of a heart attack (see, e.g., *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 & fn. 6 [113 Cal.Rptr. 162, 520 P.2d 978]), the Legislature concluded that, in light of the continuing disagreement within

the medical community, medical evidence attributing heart trouble sustained by a police officer with at least five years of service solely and exclusively to a preexisting heart disease was not sufficiently reliable to justify denying such an employee all workers' compensation benefits. Particularly in view of the long-established and unquestioned principle of workers' compensation law that "all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee" (e.g., *Lundberg* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300]), it simply belies common sense to suggest that the Legislature acted beyond the scope of its broad "plenary power" in determining that the injured employee should be given the benefit of the medical doubt on this issue.

The city appears to contend, however, that even if the Legislature had some reasonable basis for doubting the reliability of the medical theory which discounted the relationship between job stress, exertion and progressive heart disease, and even if the Legislature was properly concerned with eliminating the unequal treatment resulting from the inconclusive battle of experts in such cases, the 1959 amendment is nonetheless unconstitutionally "overbroad" because under its provisions employers *in some isolated cases* may be required to pay compensation benefits for heart attacks that are not "in fact" work related.

Initially, of course, this contention assumes the very medical dispute at issue by asserting that there are "in fact" heart attacks, sustained by employees who both suffer from progressive heart disease and have experienced stressful employment conditions, in which employment conditions have played no contributing role whatsoever. Beyond that rather fundamental defect, however, the argument is additionally flawed because it rests on the erroneous premise that legislation that is reasonably related to a legitimate public purpose may be struck down as unconstitutional simply because in some isolated instances the general terms of the legislation may not strictly align with the legislative purpose.

As we have discussed, the Legislature adopted the 1959 amendment at issue here because the case-by-case process of adjudicating the preexisting disease issue had proven incapable of producing fair and consistent results. To remedy that situation, the Legislature determined, as a matter of public policy, that in all cases the medical doubt should be resolved in the disabled employees' favor and that employers should be precluded from defeating compensation by relying on evidence of preexisting

disease. In numerous other contexts the Legislature has made a similar determination that, in order to accomplish a general public purpose, the benefits of legislation must be accorded to a broad class of beneficiaries, a class that may, in some instances, include individuals who may not be thought entitled to protection; the governing authorities have uniformly upheld such legislation in the face of constitutional attack.

In *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252], for example, the plaintiffs challenged California's newspaper retraction statute (Civ. Code, § 48a) as unconstitutional on the ground that its absolute privilege went beyond the legislative purpose of protecting legitimate journalistic endeavors and improperly shielded malicious conduct as well. Our court rejected the challenge, reasoning that "[a]lthough [the statute] extends its protection to those who may deliberately and maliciously disseminate libels, the Legislature could reasonably conclude that it was necessary to go so far effectively to protect those who in good faith and without malice inadvertently publish defamatory statements." (35 Cal.2d at p. 134.) In similar fashion, the legislative determination at issue here is not vulnerable to the city's "overbreadth" claim.

Thus, in sum, we reject the city's argument that the Legislature exceeded its authority under the state Constitution in enacting the 1959 amendment to section 3212.5.

4. *The 1959 amendment to section 3212.5 does not violate due process as an unconstitutional conclusive presumption.*

The city alternatively argues that even if the challenged provision is not invalid under article XIV section 4 of the California Constitution, the statute creates an improper "conclusive presumption" and is invalid under the due process clause of the federal Constitution. In support of this contention, the city relies in part upon a number of recent decisions of the United States Supreme Court which, under circumstances varying greatly from the case at bar, have invalidated state legislation as embodying an unconstitutional conclusive presumption. (See, e.g., *Cleveland Board of Education* v. *LaFleur* (1974) 414 U.S. 632 [39 L.Ed.2d 52, 94 S.Ct. 791]; *U. S. Dept. of Agriculture* v. *Moreno* (1973) 413 U.S. 528 [37 L.Ed.2d 782, 93 S.Ct. 2821]; *Vlandis* v. *Kline* (1973) 412 U.S. 441 [37 L.Ed.2d 63, 93 S.Ct. 2230]; *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208].) We find it unnecessary to enumerate the

various factors that distinguish each of the authorities from the instant case, for, as we explain, a more recent decision of the United States Supreme Court, *Usery* v. *Turner Elkhorn Mining Co.* (1976) 428 U.S. 1 [49 L.Ed.2d 752, 96 S.Ct. 2882], is directly on point and clearly demonstrates the lack of merit in the city's due process contention.

In *Usery,* coal mine employers attacked the constitutionality of a number of provisions of the federal Black Lung Benefits Act of 1972. Several provisions of the act, like the initial portion of section 3212.5, created a rebuttable presumption that the death of a miner, who had worked in coal mines for 10 years and who died of a respiratory disease, was caused by black lung disease and that the disease arose out of and in the course of employment. (30 U.S.C. § 921(c)(1), (2).)

Although the employer was generally free to introduce evidence to rebut these statutory presumptions, an additional statutory provision, directly analogous to the 1959 amendment to section 3212.5 at issue here, limited the employer's ability to rebut the presumption by providing that "no claim for benefits . . . shall be denied solely on the basis of the results of a chest [X-ray]." (30 U.S.C. § 923(b).) The employers in *Usery* argued, like the employer in the instant case, that the provision limiting the effect of X-ray evidence was unreasonable and transformed the rebuttable statutory presumption into an unconstitutional conclusive presumption "because X-ray evidence is frequently the sole evidence [an employer] can marshal to rebut a claim of [black lung disease]." (428 U.S. at p. 31 [49 L.Ed.2d at p. 775].)

In a rare show of agreement, the Supreme Court *unanimously* rejected the employers' constitutional challenge. The court pointed out that Congress had placed the statutory limitation on reliance on negative X-ray evidence because, as in the instant case, there was a dispute in the medical profession as to the reliability of such negative X-ray evidence. While some medical experts were of the opinion that high quality chest X-rays provided the best means of determining the presence or absence of black lung disease (428 U.S. at p. 33 [49 L.Ed.2d at pp. 776-777]), the court noted that in at least one medical study considered by Congress approximately 25 percent of a random sample of coal miners whose medical X-ray records showed no black lung disease were found, upon post-mortem examination, to have had the disease. (428 U.S. at p. 32 & fn. 34 [49 L.Ed.2d at p. 776].)

The court explained, in language directly applicable to the present case, that "[t]aking these indications of the unreliability of negative X-ray diagnosis at face value, Congress was faced with the problem of determining which side should bear the burden of unreliability." (428 U.S. at p. 32 [49 L.Ed.2d at p. 776].) Noting that "when it comes to evidentiary rules in matters 'not within specialized judicial competence or completely commonplace' it is primarily for Congress 'to amass the stuff of actual experience and cull conclusions from it' " (*id.,* at pp. 33-34 [49 L.Ed.2d at p. 777]), the court sustained Congress' legislative decision, emphasizing that simply because "Congress ultimately determined 'to resolve doubts in favor of the disabled miner' does not render the enactment arbitrary under the standard of rationality appropriate to this legislation." (*Id.,* at p. 34 [49 L.Ed.2d at p. 777].)

In similar fashion, we conclude that the California Legislature did not act arbitrarily or unconstitutionally in concluding that, in light of the continuing medical debate over the causal relationship between stress, exertion and progressive heart disease, police officers with over five years experience should be given the benefit of the medical doubt and should not be precluded from obtaining workers' compensation benefits when the only basis for finding the employee's heart trouble nonwork related rests on evidence that the employee came to his employment with a heart condition.

The award of the WCAB is affirmed.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. As will appear, I would sustain petitioner's challenge to the constitutionality of Labor Code section 3212.5 (unless otherwise indicated, all statutory references are to that code).

Generally, under the Workers' Compensation Act (§ 3201 et seq.) employees do not receive workers' compensation for injuries which are not "proximately caused by the employment." (§ 3600, subd. (c).) Thus, disabilities resulting solely from a condition which arises either before or after employment are ordinarily excluded from the application of the act. Section 3212.5, however, provides that for purposes of determining eligibility for workers' compensation benefits of policemen and other law enforcement officers, any heart trouble or pneumonia suffered by such

employees which develops or manifests itself during the course of employment cannot be attributed to any preexisting disease.

The City and County of San Francisco (hereinafter City) challenges section 3212.5 on the ground, among others, that in enacting section 3212.5 the Legislature exceeded the authority conferred upon it by the California Constitution. I agree with City.

Leonard Wiebe was employed by City as a policeman from July 13, 1943, to November 16, 1968, when he retired from the police department. Following his retirement, he worked as a special investigator for the Bank of America (hereinafter Bank) until September 3, 1972, the date of his death. Upon his death, his widow and minor child (hereinafter claimants) applied to respondent board for death benefits and compensation for burial expenses, naming City as defendant and alleging that Wiebe's death was due to stress and strain arising out of and in the course of his employment with City. At City's request Bank was subsequently joined as party defendant.

The matter was submitted to the workers' compensation judge on the basis of stipulations as to the decedent's employment history and medical evidence consisting solely of a written report and a deposition of Frederic Mintz, M.D., a cardiovascular specialist. According to this medical evidence, Wiebe died of an acute myocardial infarction resulting from coronary atherosclerosis disease, described by Dr. Mintz as a progressive condition generally originating in childhood and well established in most American male victims by the age of 25. Dr. Mintz in his deposition testified that in his opinion, Wiebe's occupation as a police officer "did not play a role in the progression of this disease." In his earlier medical report Dr. Mintz had similarly concluded, "I cannot . . . on medical grounds reasonably relate his coronary heart disease and myocardial infarction to his employment as a police officer. . . ."

The workers' compensation judge made findings that decedent sustained an injury to his heart while employed by City and that there was no evidence linking decedent's death to his employment with Bank. In his report, the judge acknowledged that there was no medical evidence indicating that decedent's disease was related to his employment as a police officer. Nevertheless, because of the section 3212.5 presumption the judge deemed himself compelled to find that decedent died as a result of a myocardial infarction ". . . which arose out of and occurred in the course and scope of his employment as a police officer for the City and

County of San Francisco." On this basis alone, an award was made to claimants. The findings and award were affirmed by the appeals board, and City has sought our review.

The statute in question, section 3212.5, provides in pertinent part: "In the case of a member of a police department of a city or municipality, . . . the term 'injury' as used in this division includes heart trouble and pneumonia which develops or manifests itself during a period while such member, . . . is in the service of the police department, . . . [¶] Such heart trouble or pneumonia so developing or manifesting itself shall be presumed to arise out of and in the course of the employment; . . . This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance with it. . . . [¶] *Such heart trouble . . . so developing or manifesting itself in such cases shall in no case be attributed to any disease existing prior to such development or manifestation.*" (Italics added.)

As will be seen the effect of section 3212.5 is to create a presumption that heart trouble which develops or manifests itself during performance of the specified work is employment related, a presumption that cannot be rebutted by evidence of any preexisting disease. (*Bussa* v. *Workmen's Comp. App. Bd.* (1968) 259 Cal.App.2d 261, 265 [66 Cal.Rptr. 204]; *Turner* v. *Workmen's Comp. App. Bd.* (1968) 258 Cal.App.2d 442, 449 [65 Cal.Rptr. 825]; *Ferris* v. *Industrial Acc. Com.* (1965) 237 Cal.App.2d 427, 431-433 [46 Cal.Rptr. 913].) The only recognized exception to the foregoing presumption arises in those cases in which a prior disease is evaluated in connection with a worker's previous compensation claim. In such instances the disability can be apportioned to the prior disease. (E.g., *State Comp. Ins. Fund* v. *Industrial Acc. Com. (Quick)* (1961) 56 Cal.2d 681 [16 Cal.Rptr. 359, 365 P.2d 415].) In the absence of any such overlapping disabilities, however, the statutory liability of employers is not affected by evidence that the employee's heart disease may have been causally related to a disease which preexisted the employment.

The constitutional and statutory origins of California's workers' compensation may be briefly examined.

Article XIV, section 4, of the California Constitution provides: "The Legislature is hereby expressly vested with plenary power, . . . to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part

of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death *incurred or sustained by the said workers in the course of their employment,* irrespective of the fault of any party." (Italics added.) City argues that in enacting section 3212.5 the Legislature impermissibly exceeded its foregoing constitutional grant of authority and, for reasons which I develop below, I agree.

Pursuant to article XIV, section 4, the Legislature enacted section 3600, imposing liability upon the employer for disabilities and death "arising out of and in the course of employment," and under subdivision (c) of the section, "[w]here the injury is proximately caused by the employment . . . ." Only employment related diseases or injuries are covered. It follows that disabilities or death which are wholly traceable to a physical condition that existed prior to employment or arose after employment terminated are excluded from the application of the act. Section 3212.5, however, purports to provide that any heart trouble or pneumonia suffered by designated public employees (police and other law enforcement officers), which develops or manifests itself during the course of employment, cannot be attributed to any preexisting disease. In effect, the Legislature has imposed upon public employers workers' compensation liability for a police officer's heart trouble, *even though a preexisting disease may have been the sole cause of the disability.* I conclude that the Legislature lacks the constitutional power to do this.

As previously noted, the only medical evidence in the record before us is the testimony of Dr. Mintz to the effect that the fatal heart attack was the result of atherosclerosis, and was in no way a consequence of, or related to, Wiebe's career as a peace officer for City. The Wiebes presented no contrary medical testimony. Accordingly, the record, as it relates to medical causation, discloses unequivocally, and beyond challenge, that the heart condition in question was neither caused nor aggravated by the deceased's city employment, but resulted solely from an earlier developmental condition. Section 3212.5, however, conclusively presumes that Wiebe's death could *not* have been caused by the earlier condition. Reduced to its barest formulation, the case before us assumes this posture—from the record, *what medically was,* from the statute, *legally cannot be.*

The majority urges that the section 3212.5 conclusive presumption is a mere regulation of evidence, a permissible control upon the manner and method of trial. Such is not the case, however, and the effect of the

section is not nearly so modest. Although a *rebuttable* presumption operates only to shift the burden of proof, or to allocate the burden of producing evidence (Evid. Code, § 601), we have held that a *conclusive* presumption "is in actuality a substantive rule of law." (*Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]; see Note, *Irrebutable Presumptions: An Illusory Analysis* (1975) 27 Stan.L.Rev. 449, 462-464; Note, *The Irrebuttable Presumption Doctrine in the Supreme Court* (1974) 87 Harv.L.Rev. 1534, 1544.) Further, we have said that such a conclusive presumption is valid only to the extent that the Legislature is empowered to achieve by direct legislation the result indirectly accomplished by the presumption. (*Kusior, supra,* at p. 619; see *Usery* v. *Turner Elkhorn Mining Co.* (1976) 428 U.S. 1, 23 [49 L.Ed.2d 752, 771, 96 S.Ct. 2882].)

In the matter before us, the constitutional directive which simultaneously confers and limits legislative power is very clear and unambiguous. The Legislature may impose workers' compensation liability for injuries suffered *"in the course of. . . employment."* (Cal. Const., art. XIV, § 4, italics added.) We have long held that affirmative grants of constitutional power are exclusive, negating any powers not specifically granted. (*Gilgert* v. *Stockton Port District* (1936) 7 Cal.2d 384, 387-389 [60 P.2d 847]; *Martello* v. *Superior Court* (1927) 202 Cal. 400, 404-406 [261 P. 476]; see also *Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 150 [118 Cal.Rptr. 14, 529 P.2d 46].) Where, as here, statutory implementation is permissive rather than mandatory the Legislature may decline to exercise the full scope of its constitutionally conferred authority. (*Ruiz* v. *Industrial Acc. Com.* (1955) 45 Cal.2d 409 [289 P.2d 229].) What it may *not* do, however, is act *beyond* the limits of that authority. Unlike a rebuttable presumption, which may result in compensation for nonwork-related injuries if the employer fails to carry the burden of proof assigned to him, a conclusive presumption, framed as an absolute prohibition against evidence of preexisting disease, necessarily and uniformly achieves the same result as an affirmative legislative command to compensate for disabilities that do not arise out of employment. The creation of a conclusive presumption, clearly and fundamentally, is no less a breach of permissible constitutional boundaries than the more direct statutory imperative.

The majority opinion justifies the conclusive presumption of section 3212.5 on the ground of administrative convenience, since it assertedly resolves a "split in medical opinion" regarding the effect of job stress.

Under the majority's analysis, the section merely settles an abstract dispute between "two competing schools of medical thought" regarding job stress. If, indeed, this was the section's only effect, the majority's error would not be so serious.

The fact is, however, that section 3212.5 is wholly silent on the controversial issue of job stress. Instead of resolving any medical dispute, the section flatly prohibits the employer from introducing evidence of a preexisting disease which might have caused the present disability. The majority persists in failing to discern that *there is no medical dispute whatever on the issue that a preexisting disease can cause heart trouble.* (See generally, *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 278-279, 281 & fn. 6 [113 Cal.Rptr. 162, 520 P.2d 978]; *Saal* v. *Workmen's Comp. Appeals Bd.* (1975) 50 Cal.App.3d 291, 294 [123 Cal.Rptr. 506]; *Greenberg* v. *Workmen's Comp. Appeals Bd.* (1974) 37 Cal.App.3d 792, 794-797 [112 Cal.Rptr. 626]; *Fontno* v. *Workmen's Comp. App. Bd.* (1969) 273 Cal.App.2d 684, 687-688 [78 Cal.Rptr. 291]; 1A Larson, Workmen's Compensation Law (1973) § 38.83, pp. 7-197 - 7-198; Note, *Workmen's Compensation—Diseases Arising Out of Employment —A Problem of Proof* (1971) 2 Pacific L.J. 678, 688-691.)

Labor Code section 3212.5 is unconstitutional because, flying in the face of indisputable medical evidence, it permits an award of workers' compensation to an employee whose job may have played no role whatever in causing his disability, contrary to the Legislature's *express constitutional* authorization. The Legislature might properly have determined that, despite medical doubt on the subject, job stress can cause heart trouble. What the Legislature cannot do constitutionally is to exclude evidence that, *in a particular case,* the disability was solely caused by a preexisting disease, rather than by job stress. This is precisely what section 3212.5 purports to provide, as will be observed from a most casual reading of the section.

The majority's reliance upon *Usery* v. *Turner Elkhorn Mining Co., supra,* 428 U.S. 1, is totally misplaced. *Usery* upheld legislation prohibiting denial of workers' disability benefits solely on the basis of a negative X-ray. As the high court explained, the provision was supported by "Congress' reasoned reservations regarding the *reliability* of negative X-ray evidence." (P. 31 [49 L.Ed.2d p. 776], italics added.) No such reasoned doubts exist with respect to the role of preexisting disease in heart disability cases.

In this regard, section 3212.5 not only exceeds the limits of the fundamental constitutional provision from which California's workers' compensation arises, but it violates due process as well. Whatever the precise standard may be for testing those conclusive presumptions contained in social welfare or similar statutory schemes (compare, e.g., *Vlandis* v. *Kline* (1973) 412 U.S. 441 [37 L.Ed.2d 63, 93 S.Ct. 2230], with *Weinberger* v. *Salfi* (1975) 422 U.S. 749 [45 L.Ed.2d 522, 95 S.Ct. 2457]), the absolute minimum criterion is reasonableness. (Cf. *People* v. *Dubose* (1974) 42 Cal.App.3d 847, 850 [117 Cal.Rptr. 235].) I acknowledge that it is no simple matter to reconcile the commendable broad constitutional requirement, on the one hand, that the workers' compensation scheme "accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character" (Cal. Const., art. XIV, § 4), a not inconsiderable task, with the inherent constitutional limitation of the work-relatedness rule, on the other. Doubtless, to achieve that accommodation, the Legislature may manipulate evidentiary rules to give claimants the benefit of every legal doubt, but it may not, through section 3212.5, award the benefit of a doubt where no doubt exists.

From the foregoing discussion, it will be seen that an attempt to resolve the problem of conflicting medical testimony, as section 3212.5 purports to do, by absolutely and conclusively eliminating any evidence of a nonjob-related factor medically capable of causing the *entire* damage for which compensation is sought, passes all the bounds of logic, common sense and reason. The Legislature may quite properly demonstrate solicitude for the health and safety of peace officers who daily safeguard the lives of our citizens, often at the risk of their own. Yet, this solicitude must find its proper expression within the bounds of the same Constitution that protects us all. In short, the section 3212.5 prohibition against any evidence of preexisting heart disease is arbitrary, capricious, and operates to deprive public entities, as employers, of a fair opportunity to protect their legitimate interests.

I would annul the decision of the appeals board.

Clark, J., and Manuel, J., concurred.

Petitioner's application for a rehearing was denied October 20, 1978. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the application should be granted.