[Civ. No. 12848. Third Dist. Oct. 6, 1971.]

JAMES R. STEPHENS, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
DEPARTMENT OF CORRECTIONS et al., Respondents.

## COUNSEL

William D. Heekin for Petitioner.

Rupert A. Pedrin, Jon L. Gateley, T. Groezinger, Loton Wells, W. R. Lowndes, James J. Vonk and Philip M. Miyamoto for Respondents.

## OPINION

**PIERCE, J.**\*—Petitioner James R. Stephens appeals from an order of respondent board denying reconsideration of findings of a referee (approved by the board) against petitioner. Petitioner, while employed at Folsom State Prison, suffered a condition of atherosclerosis which was disabling to some extent not determined. The basis of the order of the board was that petitioner's condition was not work induced. That conclusion rested upon a medical opinion which petitioner argues did not constitute substantial evidence—as opposed to the opinion of a cardiologist to the contrary which did. Neither the parties, the referee, nor the board considered the possible application of a statutory presumption (Lab. Code, § 3212.2). We are of the view that the issue of compensability cannot be fairly (or legally) settled without considering the possibility of the application and effect of such presumption. Thus, we will annul the order and remand the matter for further proceedings.

### The Facts

Petitioner began work at Folsom State Prison in 1946 and (with a three-year intermission during 1949-1951) was employed there until May 20, 1969. From 1951, and continuously thereafter for the rest of his employment, he was a correctional officer. During the last nine and a half years he was a tower officer. All of his work was performed under stresses and tensions. Work in the tower was particularly so.

The tower was elevated above, and overlooked, two exercise yards pro-

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

vided for particularly recalcitrant and aggressive inmates in the prison's adjustment center. There had been frequent fighting of special severity during the last three and a half years of petitioner's employment. He was armed with a rifle and a pistol. In quelling fights it was the practice of guards to blow a whistle when a fracas started, then "shoot a warning shot into the bank, and if they didn't stop their fighting, why, then you would have to fire at their feet." As an estimate, the guards would have to fire 30 rounds a month. They are holding a rifle and watching at all times. Regarding stress, petitioner testified, "you got this rifle in your hand at all times, and you are —you never know when you are going to have to fire down at the inmates. Any time you have to aim a rifle at another human being, it is going to be stress." Most times "they will stop with just a warning shot into the bank." (Since both sides agree that stress and tension were excessive in petitioner's job, we do not emphasize the testimony in this regard.)

In December 1967 petitioner suffered cramping and numbness in his legs and feet; he was admitted to the Sutter Hospital in Sacramento where an operation was performed on his legs. Extensive atheromatous disease was found in the right iliac artery. The diagnosis on discharge was that he had acute and chronic arteriosclerotic occlusive disease in the right common and external iliac arteries.

Petitioner returned to work in April 1968. During this last year of his employment, he noticed a sensation—a pressure in his legs and feet when he was advised that the convicts were entering the exercise yard. Petitioner seemed to be doing well on his recovery when, one morning, his legs gave out and he was forced to seek a medical retirement.

### The Presumption Created by Labor Code Section 3212.2

We believe the views we hold will be more understandable if we interrupt the factual discussion and precede analysis of the medical evidence by setting forth the provisions and legislative policy evident in the Labor Code section captioned above. Section 3212.2 provides in relevant part: "In the case of officers and employees in the Department of Corrections having custodial duties, . . . the term 'injury' includes heart trouble which develops or manifests itself during a period which such officer or employee is in the service of such department or hospital.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Such heart trouble so developing or manifesting itself in such cases shall be presumed to arise out of and in the course of the employment. This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance

with it." This section is part of a legislative scheme which provides for the existence of such a presumption also in the case of firemen, policemen, sheriffs and their deputies, and other enumerated law enforcement personnel. (§ 3212. All code references herein are to the Labor Code.)

Two factors vital in this matter become apparent as one reads this legislation and considers its purpose. ■ First, the presumption is available not only in cases where heart trouble has "manifested" itself (i.e., has produced definite symptoms such as angina attacks or abnormal electrocardiograms) but also where it has "developed" (i.e., where it exists but remains in an asymptomatic stage.) Second, the Legislature has resolved in favor of workmen in the enumerated stressful occupations a question which some members of the medical profession (as disclosed by the evidence in this matter) dispute—do stressful occupations cause heart trouble? ■ It has delivered a legislative mandate: stressful occupations of these classes not only can cause heart trouble, there is a presumption that they do.

### The Medical Evidence

Meyer Friedman, M.D., on the staff of Mt. Zion Hospital, San Francisco, director, Harold Brunn Institute, submitted a report and testified on behalf of petitioner. He is a graduate of Johns Hopkins Medical School and specializes in cardiology in which he holds a fellowship. He has written more than 400 treatises, mostly in the field of atherosclerosis in cardiovascular diseases, and is the author of a book published in 1969 entitled Pathogenesis of Coronary Artery Disease. ■ (We judicially notice and the evidence sustains a seemingly undisputed inference that a sufficiently developed atherosclerosis of the coronary artery is "heart trouble.")

Dr. Friedman, specifically addressing himself to emotional stress as it may pertain to coronary artery disease, has engaged in extensive research, trying, as he expressed it, "to find our way out of the wilderness." He frankly admitted that some cardiologists would probably be arguing over emotional stress as a cause for the next 50 to 100 years, but that the American Medical Association now lists it as a cause and affirmed that "a great deal of emphasis can be placed on this factor." After his examination of petitioner he testified: "This stress, in my opinion, in some way seriously aggravated the what otherwise would have been a slow course of peripheral atherosclerosis."

An electrocardiogram of petitioner had been within normal limits. The patient's history had been negative of any chest pain. Nevertheless, the doctor stated: "But I am pretty sure he's got severe coronary arteriosclerosis. I don't think it is symptom producing yet." He added, however,

"[y]ou must remember a coronary artery must be 85 to 90% occluded before it produces symptomology. . . . I can't definitely say . . . [Stephen's] coronary arteries are 90% connected, but I would be willing to bet 20 to 1 there would be not too severe coronary atherosclerosis, one or two grade." That conclusion he drew from the fact that there was an admitted (demonstrated) peripheral atherosclerosis of the right leg,[1] that the coronary arteries and not the arteries of the leg are where atherosclerosis first develops. He said, "the heart is so selectively involved because the heart is so rapidly in motion throughout the day—it is twisting and turning—and the arteries are subjected there to more stress and strain than other arteries which are well anchored. They don't have to telescope upon themselves—as the heart contracts. . . . In the last two years I have been overwhelmed by the frequency of coronary and other kinds of atherosclerosis in people in association with the Adjustment Center of a prison. I think as soon as they get there, they get tensed up." In another place the doctor testified: "So, in our minds, there isn't any question that emotional stress is aggravating the course of coronary artery disease."

Paul DeSilva, M.D., was the physician who examined petitioner on behalf of the carrier. He filed a report and also testified. He is an internist who practices in San Francisco, devoting about one-third of his practice to cardiology. There were instances in which his testimony agreed with the report and testimony of Dr. Friedman. He agreed that petitioner's employment was a "stressful job"—"an unusually stressful job." He also agreed that an arteriosclerotic occlusion would have to reach a high degree of closure before it would be revealed in an electrocardiogram. Dr. DeSilva recounted a case history of a person whose electrocardiogram had been normal one day and who died the next day (of cancer). An autopsy showed the brain—another source of rapidly developing athereosclerosis—"had pipestem arteries . . . like an old man." Again, and expressed in percentages, both doctors testified that occlusion before it would be shown in an electrocardiographic test would reach 80 to 90 percent. The two doctors also agreed that arteriosclerosis to an extent where it would be characterized as "trouble" would occur much more frequently in the coronary arteries of the heart than in the arteries of the leg. They agreed than an embolus or thrombus was the cause of the complete peripheral artery occlusion of Mr. Stephens' leg requiring surgery. (See fn. 1, *supra*.)

That was the extent of their agreement. Dr. DeSilva stated and restated that in his opinion stress and stressful occupations do not cause or relate to acceleration of any arteriosclerosis. He argued that the majority of

---

[1]Both doctors testified that the total peripheral occlusion of the arteries of the leg occurred in this case because of the presence of a thrombus or embolus.

medical opinion was to that effect. He even characterized the theory (and thus the opinion of Dr. Friedman) as being a "ridiculous assumption."

That requires this court at this point to pause to reflect where that leaves us in this matter.

Statistically we cannot assert at the appellate level on the basis of this record that the majority of doctors *do* accept the proposition that stress and tension relate to acceleration of arteriosclerosis of the coronary artery. But what we can and must assert is that the Legislature has declared that in workmen's compensation applications stress and tension are to be taken into consideration. We have pointed out above that sections 3212 and 3212.2 have allied the state in workmen's compensation cases with those medical practitioners who disagree with doctors holding Dr. DeSilva's beliefs. ■ It is impermissible for a compensation carrier to "repeal" this legislation, wiping out the presumption created by section 3212.2, by seeking out a doctor whose beliefs preclude its possible application. It is impermissible for the board or its referee to accept the opinion of a physician so disposed as the basis for disallowing a claim.

### Rules Applicable to the Scope of Review of Board Orders Generally

■ An appellate court must sustain the board's conclusions if they are supported by substantial evidence. ■ Evidence is not substantial where a vital issue rests upon medical evidence and that which supports the board's order is based upon surmise, speculation, conjecture, or guess. Recent cases of our Supreme Court which have enunciated those rules are *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432], and *Place* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656]. In the latter case, quoting an earlier case, the court said, " 'an expert's opinion which does not rest upon relevant facts *or which assumes an incorrect legal theory cannot constitute substantial evidence. . . .*' " (Italics ours.)

In *Michon* v. *Workmen's Comp. App. Bd.* (1971) 15 Cal.App.3d 917, 923 [93 Cal.Rptr. 476] (hg. den.), this court reiterated that which appellate courts have unavailingly stated over and over again currently—that the board must construe workmen's compensation laws liberally " 'with the purpose of extending their benefits for the protection of persons injured in the course of their employment.' "

We think the legislative philosophy was obvious. It is but to state the obvious to say that benefits payable by employers to employees under the workmen's compensation laws are modest indeed as compared with personal injury verdicts. True, the latter are predicated upon negligence. But the

scope of the law of negligence (and particularly that element of negligence which is embraced within the duty of care) keeps broadening. ■ The law of workmen's compensation is a limited form of liability without fault. Many believe that over the years it has proved a boon greater to the employer than to the employee. The Legislature does not deem liberal construction of employee benefits an adjunct to workmen's compensation laws that is harsh on the employer. And the courts have given heed to the legislative policy.

In the case at bench, contrary to the referee's finding (and the board's acceptance of that finding), it was not Dr. Friedman whose opinion was incredible or "ridiculous"; it was the contrary opinion which, as we have pointed out above, either ignored or overlooked the plain import of section 3212.2.

Still, this court may not usurp the board's exclusive fact finding power. Section 3212.2 creates a presumption. That presumption, however, is rebuttable. ■ It was and is possible, both fairly and legally, for the board to find that the presumption never arose; that it was absent because no heart trouble which is disabling exists. It could have disbelieved Dr. Friedman; but it could not reject his opinion without substituting the opinion of a doctor willing to accept the premises Dr. DeSilva refuses to accept that stress and tension do cause heart trouble.[2]

The order under review is annulled. The matter is remanded to the board for further proceedings not inconsistent with the views expressed herein.

Regan, Acting P. J., and Bray, J.,* concurred.

A petition for a rehearing was denied November 2, 1971, and the petitions of respondents Workmen's Compensation Appeals Board and Department of Corrections for a hearing by the Supreme Court were denied December 2, 1971.

---

[2] Dr. DeSilva *did* state a second trench if-the-moon-were-made-of-green-cheese-how-would-it-taste argument. He said that even if stressful employment were to be accepted as a causative factor "which I don't adhere to" all of the arteries would be involved. In saying that the doctor contradicted himself. He had already conceded: (1) that coronary arteries characteristically have accelerated occlusion earlier; (2) that peripheral (leg) arteries are much less likely to occlude; (3) that Mr. Stephens' leg arteries occluded completely only because such occlusion was brought on by an embolus or thrombus (see fn. 1). He also (contrary to the legislative command of § 3212.2) evinced an unwillingness to accept heart trouble upon its "development"—only upon its "manifestation." Such an opinion was "based on surmise, speculation, conjecture . . . [and] guess." (*Place* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 372, 378.)

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.